# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED

SEP 1 0 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No.   '19 MJ 3867
Apple iPhone, FP&F Case # 2019250400223901, )
Line Item 0003 )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1.

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 952 and 960 | Importation of Controlled Substances |

The application is based on these facts:
See Affidavit of HSI Special Agent Greg Pettigrew, which is hereby incorporated by reference and made part hereof.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Greg Pettigrew, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __9/10/19__

*Judge's signature*

City and state: San Diego, CA        Hon. Jill L. Burkhardt, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Greg Pettigrew, Special Agent with the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), being duly sworn, hereby state as follows:

## INTRODUCTION

1. This affidavit supports an application for a warrant to search the following electronic devices:

>Apple iPhone
>FP&F Case # 2019250400223901
>Line Item 0003
>(**Target Device 1**)

>Black Smartphone
>FP&F Case # 2019250400223901
>Line Item 0003
>(**Target Device 2**) (collectively, the **Target Devices**)

as described in Attachments A-1 and A-2 (incorporated herein by reference), and seize evidence of crimes, specifically, violations of Title 21, United States Code, Section(s) 952 and 960. This search supports an investigation of DAVID CARDENAS-VEGA for the crimes mentioned above. A factual explanation supporting probable cause follows.

2. The **Target Devices** were seized from a vehicle driven by CARDENAS-VEGA on August 28, 2019, at the time of his arrest at the San Ysidro, California Port of Entry (POE), as he attempted to smuggle methamphetamine into the United States. The **Target Devices** are currently in the possession of the Department of Homeland Security and are presently stored at 9495 Customhouse Plaza, San Diego, California 92154.

3. Based upon my experience and training, and all the facts and opinions set forth in this Affidavit, I believe that there is probable cause to believe that a search of the **Target Devices** as described in Attachments A-1 and A-2 will produce evidence of the aforementioned crimes, as described in Attachment B.

1

4. The information contained in this affidavit is based upon my experience, training, and consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Devices**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause. Dates, times, and amounts are approximate.

## EXPERIENCE AND TRAINING

5. I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I am cross-designated and have the authority to conduct Title 21 investigations and enforcement activities. I have been involved with investigations for Title 21 offenses and am familiar with the Interagency Cooperation Agreement between the U.S. Drug Enforcement Administration (DEA) and ICE. I am also a federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. I am authorized under Rule 41(a) to make applications for search and seizure warrants and to serve arrest warrants.

6. I am a Special Agent (SA) with Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), and have been so employed since July 2017. My duties include, among others, investigating the trafficking of illicit controlled substances and the importation and distribution of illegal substances. Prior to becoming a Special Agent with HSI, I was a Border Patrol Agent for 11 years. In addition to performing the traditional Border Patrol mission, I was a member of the Joint Targeting Team (JTT) within the Sector Intelligence Unit (SIU), which conducted targeted investigations of Transnational Criminal Organizations (TCOs) involved in the illegal movement of people across the United States/Mexico International Boundary.

7. I am a graduate of the Federal Law Enforcement Training Center at Glynco, Georgia where I received training in a wide-range of subject areas, including narcotics trafficking.

8. During my tenure with HSI, I have participated in the investigation of numerous Drug Trafficking Organizations (DTOs), which have resulted in the issuance of search warrants, the seizure of narcotics, weapons, and currency, and the indictment and arrest of persons. Through these investigations, I have gained a working knowledge and insight into the typical activity of narcotics smugglers and the structure of their narcotics smuggling networks. I also have gained information as to the normal operational habits of persons who make their living as narcotics smugglers.

9. I also have spoken with other agents about their experiences and the results of their investigations and interviews. I have become knowledgeable of the methods and modes of narcotics operations, including the methods of operation typically used by narcotics traffickers. I have learned that narcotics traffickers often require the use of one or more telephone facilities to negotiate times, places, schemes, and manners for importing, possessing, concealing, manufacturing, and distributing controlled substances and for arranging the disposition of proceeds from the sale of controlled substances. I also know from training and experience that drug traffickers periodically change or "drop" their telephones and/or telephone numbers in an attempt to avoid law enforcement interception of their conversations. Moreover, it is my experience that narcotics distributors purposefully use multiple communication devices (for example, cellular telephones) to keep law enforcement from understanding the full scope of their own and/or their organization's illicit conduct in the event that their communications are being intercepted. I also know that drug traffickers frequently use text messaging to communicate with other traffickers in an effort to thwart law enforcement interception of communications.

10. Conspiracies involved in the smuggling and trafficking of narcotics generate many types of evidence including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel and payment, names,

photographs, text messaging, and phone numbers of co-conspirators. For example, based on my training and experience, I have learned that load drivers smuggling controlled substances across the border are often in telephonic contact with co-conspirators immediately prior to and following the crossing of the load vehicle at which time they receive instructions on how to cross and where and when to deliver the controlled substances.

11. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

a. Drug traffickers and their accomplices often will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

b. Drug traffickers and their accomplices often will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

c. Drug traffickers and their accomplices often will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

d. Drug traffickers often will use cellular/mobile telephones to communicate with drivers, including to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

e. Drug traffickers often will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

f. The use of cellular telephones by drug traffickers and their accomplices tends to generate evidence that is stored on the cellular telephones, including but not limited to emails, text messages, photographs, audio files, videos, call logs, address book entries, IP addresses, social network data, and location data.

12. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience investigating these conspiracies that searches of cellular/mobile telephones yields evidence:

    a. tending to indicate efforts to import methamphetamine or some other federally controlled substances from Mexico into the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the importation of methamphetamine or some other federally controlled substances from Mexico into the United States;

    c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine or some other federally controlled substances from Mexico into the United States;

    d. tending to identify travel to or presence at locations involved in the importation of methamphetamine or some other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

    e. tending to identify the user of, or persons with control over or access to, the target devices; and/or

    f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

13. On August 28, 2019, at approximately 1:15 a.m., CARDENAS-VEGA applied for admission into the United States from Mexico at the San Ysidro, California Port of Entry as the registered owner, sole occupant, and driver of a 2012 Nissan Titan bearing California license plates (the vehicle). In pre-primary, a canine alerted to the vehicle. CARDENAS-VEGA stated that he was going to Chula Vista, California and that he had nothing to declare. The vehicle was referred to the secondary inspection area.

14. In secondary, a Z-Portal scan revealed anomalies in the spare tire and gas tank of the vehicle. A total of 115 packages weighing 56.18 kg (123.9 lbs.) were removed from the vehicle's spare tire and gas tank. The packages tested positive for methamphetamine.

15. The vehicle, drugs, and the **Target Devices** were seized.

16. Post-arrest, CARDENAS-VEGA was advised of his *Miranda* rights and waived them. CARDENAS-VEGA admitted knowledge of the narcotics in the vehicle and stated that he was being paid.

17. Based upon my experience investigating drug smuggling, my training, and my consultation with other investigators who have experience investigating drug smuggling near the border, I understand that drug smugglers will seek to smuggle drugs from Mexico into the United States by hiding the drugs in hidden compartments of cars, and in non-factory compartments (*i.e.*, compartments that the manufacturer did not design for ordinary use). Smugglers will then drive north from Mexico and seek to pass through POEs with the drugs undetected. When they arrive in the United States, smugglers often will take the drugs to a discreet location to transfer them to other people involved in the distribution chain who can then send the drugs to other locations for downstream distribution.

18. Given the facts surrounding CARDENAS-VEGA's arrest and based upon my experience and training, as well as consultation with other law enforcement officers

experienced in drug smuggling investigations, I submit that there is probable cause to believe that information relevant to the smuggling activities of CARDENAS-VEGA will be found in the **Target Devices**. Such evidence could be in the form of communications, records, data (including but not limited to emails, text messages, other social messaging applications), photographs, audio files, videos, or location data.

19. I also know that drug trafficking conspiracies require intricate planning and coordination to successfully evade detection. Based upon my professional training and experience, this planning and coordination often occurs days, weeks, or even months prior to the actual importation of the drugs into the United States. Additionally, co-conspirators are often unaware of a subject's arrest and will continue to attempt to communicate with the subject after the arrest to determine the whereabouts of valuable cargo, particularly in the hours following the arrest. Therefore, I believe that the appropriate date range for the search of the **Target Devices** is from July 28, 2019, up to and including August 28, 2019.

## METHODOLOGY

20. It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and/or serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the

device. Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

21. Following the issuance of this warrant, I will collect the subject cellular/mobile telephones and subject them to analysis. All forensic analysis of the data contained within the telephones and their memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

22. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

23. Based on all of the facts and circumstances described above, there is probable cause to conclude that CARDENAS-VEGA used the **Target Devices** to facilitate violations of Title 21, United States Code, Section(s) 952 and 960.

24. Because the **Target Devices** were promptly seized during the investigation of CARDENAS-VEGA's trafficking activities and have been securely stored, there is probable cause to believe that evidence of illegal activities committed by CARDENAS-VEGA and others continues to exist on the **Target Devices**.

25. WHEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search

the item described in Attachments A-1 and A-2, and seize the items listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Greg Pettigrew
Special Agent
Homeland Security Investigations
Department of Homeland Security

Subscribed and sworn to before me this __10__ day of September, 2019.

_____
The Honorable Jill L. Burkhardt
United States Magistrate Judge

9

## **ATTACHMENT A-1**
PROPERTY TO BE SEARCHED

The following property is to be searched:

>Apple iPhone
>FP&F Case # 2019250400223901
>Line Item 0003
>**(Target Device 1)**;

**Target Device 1** is currently in the possession of the Department of Homeland Security at 9495 Customhouse Plaza, San Diego, California 92154.

## **ATTACHMENT A-2**
PROPERTY TO BE SEARCHED

The following property is to be searched:

> Black Smartphone
> FP&F Case # 2019250400223901
> Line Item 0003
> **(Target Device 2)**;

**Target Device 2** is currently in the possession of the Department of Homeland Security at 9495 Customhouse Plaza, San Diego, California 92154.

## **ATTACHMENT B**
ITEMS TO BE SEIZED

Authorization to search the cellular/mobile telephones described in Attachments A-1 and A-2 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephones for evidence described below. The seizure and search of the cellular/mobile telephones shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of July 28, 2019, up to and including August 28, 2019:

a. tending to indicate efforts to import methamphetamine or some other federally controlled substances from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services – such as email addresses, IP addresses, and phone numbers – used to facilitate the importation of methamphetamine or some other federally controlled substances from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine or some other federally controlled substances from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine or some other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

**which are evidence of violations of Title 21, United States Code, Sections 952 and 960.**